******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* JAMES P.
CARTER, JR.
(AC 35511)

Bear, Keller and Pellegrino, Js.*

*Argued February 20—officially released July 15, 2014*

(Appeal from Superior Court, judicial district of New
Britain, D'Addabbo, J.)

*Glenn W. Falk*, assigned counsel, for the appellant
(defendant).

*Margaret Gaffney Radionovas*, senior assistant
state's attorney, with whom, on the brief, were *Brian
Preleski*, state's attorney, and *Paul N. Rotiroti*, senior

assistant state's attorney, for the appellee (state).

*Opinion*

PELLEGRINO, J. The defendant, James P. Carter, Jr., appeals from the judgment of conviction, rendered after a jury trial, of murder pursuant to General Statutes § 53a-54a, and criminal violation of a restraining order pursuant to General Statutes § 53a-223b. The defendant claims that his conviction of criminal violation of a restraining order was improper because the state provided insufficient evidence to prove that a restraining order was in effect on the date in question that prohibited him from assaulting the victim, Tiana Notice. We disagree and affirm the judgment.

The jury reasonably could have found the following facts. The defendant dated the victim for approximately one year before their relationship ended in early January, 2009. After the relationship ended, the defendant continued to contact the victim via text messages, telephone calls, and e-mails. On January 8, 2009, the court granted the victim's petition for an ex parte restraining order. The restraining order stated, inter alia, that the defendant "shall refrain from threatening, harassing, stalking, assaulting, molesting, sexually assaulting or attacking the [victim]." The order also stated: "An ex parte restraining order is only effective until the date of the [scheduled] hearing unless extended by agreement of the parties or by order of the court for good cause shown. A restraining order after hearing remains effective for six months from the date of the order unless a shorter period is ordered by the court." The court scheduled a hearing to take place on January 16, 2009. On February 14, 2009, the defendant stabbed the victim eighteen times, piercing her heart and eventually killing her.

At trial, the state presented the ex parte restraining order as evidence that the defendant was guilty of criminal violation of a restraining order. Attorney Patricia Lindlauf, the deputy chief clerk of the New Britain judicial district, testified that Judge Prestley issued the ex parte order on January 8, 2009. She also testified that the ex parte order prohibited the defendant from assaulting the victim and that the order was "in effect." The state did not attempt to enter into evidence a restraining order issued after January 16, 2009, the date of the scheduled hearing and the date that the ex parte order was set to expire.

The defendant's statements and the victim's actions after January 16, 2009, however, demonstrated that a restraining order had been issued after the scheduled hearing. On the day of the murder, the victim brought two e-mails to the police that the defendant had sent her on February 13, 2009. In one of the defendant's e-mails to the victim, he stated: "Please don't tell the cops about this . . . . Please . . . get rid of the restraining order so I can get this job, hire me a lawyer

[and] see what's going on with my son. I'm extremely nervous. You know I'm taking a big risk by talking to you." On February 14, 2009, the date of the murder, Officer Mark Connoy of the Plainville Police Department called the defendant to investigate the e-mail. Connoy stated to the defendant that he was investigating e-mails "sent to a certain person that aren't supposed to be sent." The defendant told Connoy that he did not send any e-mails to the victim because "we have a restraining order against each other [and] I can't send her anything." After Connoy indicated that he was going to continue his investigation into the source of the e-mails,[1] the defendant ended the conversation by commenting: "I would never violate the restraining order. I know that there's [a] full restraining order and . . . I've moved on."[2] This conversation took place less than two hours before the victim was stabbed. Additionally, on the basis of the form that the court used to issue the ex parte order on January 8, 2009, which was a full restraining order that was admitted as a full exhibit, the jury reasonably could have found that the restraining order after hearing—the existence of which was admitted by the defendant—included a prohibition against assaulting the victim because the same form is used both for ex parte restraining orders and for a restraining order after hearing.[3]

After the state concluded its presentation of the evidence, the defendant moved for a judgment of acquittal, arguing that the ex parte restraining order had expired on January 16, 2009, and that the state had not proven beyond a reasonable doubt that there was a restraining order in effect on February 14, 2009. The court denied the motion on the basis of Lindlauf's testimony that a restraining order was "in effect," and the testimony of Corporal Patrick J. Buden of the Plainville Police Department that he identified the defendant by searching the police restraining order database.[4] After the defendant finished his presentation of the evidence, he renewed his motion for a judgment of acquittal. The court denied the motion on the same ground.[5] The jury found the defendant guilty of murder and violating a restraining order. This appeal followed.[6]

On appeal, the defendant claims that there was insufficient evidence to convict him of violating a restraining order because the relevant order was not entered into evidence. He initially argues that there was insufficient evidence to prove that a restraining order was in effect on the date of the murder. He then argues that there was insufficient evidence to prove the terms of any purported restraining order. Specifically, the defendant argues that the terms of the ex parte restraining order are an insufficient basis from which the jury may infer the terms of a posthearing order, and, therefore, the evidence was insufficient for the jury to find that he violated a restraining order.

"The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Hasfal*, 94 Conn. App. 741, 743, 894 A.2d 372 (2006). "[I]n [our] process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct." (Internal quotation marks omitted.) *State* v. *Fagan*, 280 Conn. 69, 80, 905 A.2d 1101 (2006), cert. denied, 549 U.S. 1269, 127 S. Ct. 1491, 167 L. Ed. 2d 236 (2007).

"[T]he [finder of fact] must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense . . . ." (Internal quotation marks omitted.) *State* v. *Hasfal*, supra, 94 Conn. App. 744. "[P]roof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Internal quotation marks omitted.) *State* v. *Fagan*, supra, 280 Conn. 80.

"It is within the province of the jury to draw reasonable and logical inferences from the facts proven. . . . The jury may draw reasonable inferences based on other inferences drawn from the evidence presented." (Internal quotation marks omitted.) *State* v. *Winter*, 117 Conn. App. 493, 507, 979 A.2d 608 (2009), cert. denied, 295 Conn. 922, 991 A.2d 569 (2010). "[I]n viewing evidence which could yield contrary inferences, the [trier of fact] is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence. The rule is that the [trier of fact's] function is to draw whatever inferences from evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Larsen*, 117 Conn. App. 202, 207, 978 A.2d 544, cert. denied, 294 Conn. 919, 984 A.2d 68 (2009). "Our review is a fact based inquiry limited to determining whether the inferences drawn by the jury are so unreasonable as to be unjustifiable. . . . [W]e do not sit as a [thirteenth] juror who may cast a vote against the verdict based upon our feeling

that some doubt of guilt is shown by the cold printed record." (Citation omitted; internal quotation marks omitted.) *State* v. *Winter*, supra, 507.

The jury found the defendant guilty of violating a restraining order by assaulting the victim. "[T]he violation of a protective order statute is not a specific intent crime. All that is necessary is a general intent that the defendant intended to perform the activities that constituted the violation." (Footnote omitted.) *State* v. *Larsen*, supra, 117 Conn. App. 208. In order to find the defendant guilty, the jury was required to find beyond a reasonable doubt that: (1) a restraining order was issued against the defendant; (2) the defendant had knowledge of the terms of the order; (3) the defendant committed an assault against the person protected by the order; and (4) the assault violated the order. General Statutes § 53a-223b (a) (1) (A) and (2) (D). The defendant does not argue that there was insufficient evidence that he assaulted the victim; he argues that the evidence was insufficient as to the remaining elements. We conclude that the state adduced sufficient evidence at trial for the jury to find the defendant guilty.

There was sufficient evidence for the jury to conclude, beyond a reasonable doubt, that a restraining order was issued against the defendant and that the defendant had knowledge of the terms of the order. In an e-mail to the victim on the day before the murder, the defendant acknowledged the existence of the restraining order and asked the victim to have it lifted. More importantly, the jury listened to the defendant's conversation with Connoy that took place less than two hours before the murder. During Connoy's conversation with the defendant, he admitted that the victim had a restraining order against him. The defendant stated that "[the victim and I] have a restraining order against each other," and "I know there's [a] full restraining order . . . ."

In addition to the evidence of the defendant's subjective belief, there also was other independent evidence that a restraining order was in effect. During the conversation that took place two hours before the murder, Connoy stated that he was investigating e-mails "sent to a certain person that aren't supposed to be sent." The jury reasonably could have inferred that Connoy stated that the e-mails should not have been sent because there was a restraining order in place at the time. Furthermore, as part of responding to the victim's 911 call, police were able to determine the defendant's identity by searching records of domestic situations and restraining orders. See footnote 4 of this opinion. The jury reasonably could have found that the cumulative effect of this independent evidence, coupled with the defendant's admission that a restraining order was in effect, amounted to proof beyond a reasonable doubt that a restraining order was in effect on the date of

the murder.

Not only did the defendant admit, less than two hours before the murder, that there was a valid restraining order in place, he also admitted that he had knowledge of the terms of that order. The defendant told Connoy that, pursuant to the restraining order, "I can't send her anything." He also stated, "I would never violate the restraining order," from which the jury reasonably could infer that he knew the terms of the restraining order and how to comply with them. On the basis of the defendant's admissions during his conversation with Connoy, we conclude that there was sufficient evidence for the jury to find that the defendant was aware of the restraining order's terms, including the prohibition against assaulting the victim.

The ex parte restraining order, which was entered into evidence, prohibited the defendant from, inter alia, assaulting the victim. The state argues that the ex parte restraining order provides a reasonable basis for the jury to infer that assaulting the victim violated the terms of the restraining order in effect at the time of the murder. The issue before us is whether this inference was so unreasonable as to be unjustifiable. *State* v. *Winter*, supra, 117 Conn. App. 507. We conclude that it was not.

The terms of the ex parte restraining order provided a reasonable basis for inferring that a prohibition on assaulting the victim was a term of the subsequent restraining order.[7] The victim initially petitioned the court for an ex parte restraining order because the defendant continued to contact her via text messages, telephone calls, and e-mails after their relationship ended. The court granted the ex parte petition and ordered the defendant to refrain from contacting or assaulting the victim. The state introduced evidence, however, that an e-mail from "Jessica Banderas" was sent to the victim from the defendant's computer on January 10, 2009, and that "Jessica Banderas" did not exist. The reasonable inference to be drawn from this evidence is that the defendant continued to contact the victim despite the ex parte restraining order and attempted to conceal his identity to avoid being charged with violating the restraining order.

Viewing these facts in a light most favorable to sustaining the verdict, as we must, the jury reasonably could have concluded that the subsequent restraining order prohibited the defendant from assaulting the victim. The conduct that gave rise to the ex parte restraining order—unwanted communications via telephone and e-mail—continued after the ex parte order was issued. Because the defendant continued to engage in the same conduct that originally resulted in the ex parte court order, which was a full restraining order,[8] it is reasonable to assume that continuing to engage in the same conduct would result in the court's imposing

the same terms in a subsequent restraining order, including a prohibition on assaulting the victim.

At oral argument before this court, the defendant argued, by way of analogy to the best evidence rule, that the state must enter the relevant restraining order into evidence in order to convict him of violating that order. The best evidence rule states: "[I]n proving the terms of a writing, where the terms are material, the original writing must be produced unless it is shown to be unavailable for some reason other than the serious fault of the proponent." (Internal quotation marks omitted.) *Brookfield* v. *Candlewood Shores Estates, Inc.*, 201 Conn. 1, 10, 513 A.2d 1218 (1986). The purpose of this rule is not to exclude evidence, but instead to express the court's preference for admitting an original document into evidence when the document's terms are at issue. Id., 12. Although the best evidence rule is not dispositive in this case, we acknowledge that it would have been preferable for the state to enter the operative restraining order into evidence. The fact that the state failed to do so, however, does not make its evidence automatically insufficient. Even though the state's evidence that the defendant violated the terms of the restraining order was circumstantial, that does not diminish its probative force or the reasonableness of the inference that the subsequent restraining order also prohibited the defendant from assaulting the victim.

The jury reasonably and justifiably could have concluded that the terms of the subsequent restraining order were the same as those in the ex parte order and, therefore, included a prohibition on assaulting the victim. It would have been unreasonable, in light of the evidence that tended to show that the defendant did not comply with the ex parte order, to infer that the court would have originally ordered the defendant to refrain from assaulting the victim but then, in a subsequent restraining order, not prohibit the defendant from doing so.[9] The jury reasonably could have found that the terms of the restraining order in effect at the time of the murder were substantially the same as the terms of the ex parte restraining order. See *State* v. *Taylor*, 306 Conn. 426, 436, 50 A.3d 862 (2012). We therefore conclude that there was sufficient evidence adduced at trial for the jury to find beyond a reasonable doubt that assaulting the victim violated the terms of the restraining order in effect on the day of the murder.

After consideration of the defendant's arguments on appeal, we note that he did not raise any objection before the trial court that the ex parte order was irrelevant to proving the terms of a subsequent restraining order. He also did not cross-examine Lindlauf to clarify whether she was testifying to the terms of a posthearing restraining order that was not in evidence, and, if so, then object to her testimony on the basis of the best

evidence rule. The defendant thus allowed the state to admit the ex parte order into evidence without objection. The evidence before the jury was sufficient for it to find the defendant guilty of criminal violation of a restraining order beyond a reasonable doubt.

The judgment is affirmed.

In this opinion the other judges concurred.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] The defendant suggested to Connoy during this conversation that "Jessica Banderas," a love interest who harbored ill will against the victim, may have sent the e-mail in question. The police determined that "Banderas" did not exist on the basis of the information that the defendant provided.

[2] The ex parte order was a "full" restraining order because of numerous prohibitions designed to prevent the defendant from having contact in any manner with the victim.

[3] The official form used for the ex parte restraining order in this case was form JD-FM-139. That form is used both for an ex parte restraining order and for a restraining order after hearing. The form sets forth each of those choices with a box to be checked to designate which type of order is being entered. In the middle of the first page of the form under the heading, "RESTRAINING ORDER—RELIEF FROM ABUSE," is the clause, "ON THIS DATE IT IS HEREBY ORDERED THAT . . . ." One of the choices is that the "[r]espondent shall refrain from . . . assaulting . . . the Protected Person." On page two of the form is the statement: "A RESTRAINING ORDER AFTER HEARING remains effective for six months from the date of the order unless a shorter period is ordered by the court."

[4] Corporal Buden testified that on February 14, 2009, the victim called 911 and stated that her former boyfriend had stabbed her. Buden testified that, as part of responding to the call, he "researched [the police department's] in-house records" regarding domestic situations and restraining orders and was able to determine the identity of the victim's former boyfriend because he "found the name on . . . reports from past dealings."

[5] In doing so, the court recounted Lindlauf's testimony: "[T]he jury can reject [her testimony], but Ms. Lindlauf says—I had the court monitor play it back for me—that she said there was a restraining order existing at the time. Now, is that the clearest? No. But it's subject to legal inference—some logical inferences that can be drawn by a jury in making that determination. So, for that reason the court will deny . . . [the] request for judgment of acquittal."

[6] The court sentenced the defendant to sixty years of incarceration for the murder conviction and five years of incarceration for violation of the restraining order. The sentences were to run concurrently. Although the defendant received concurrent sentences, his appeal is not moot because "[t]he collateral consequences of a conviction are legion: subsequent convictions might, as a result, carry heavier penalties and a wide range of civil rights might be affected . . . ." *Barlow* v. *Lopes*, 201 Conn. 103, 112–13, 513 A.2d 132 (1986).

[7] See footnote 3 of this opinion.

[8] See footnote 2 of this opinion.

[9] The prohibition against assaulting the victim would have been included whether the order was a partial or full restraining order.